# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JAMES S. PARS | ) |
| | ) |
| Plaintiff, | ) Civil Action No. |
| | ) |
| v. | ) |
| | ) |
| CENTRAL INTELLIGENCE AGENCY, | ) |
| Washington, D.C. 20505 | ) |
| | ) |
| and | ) |
| | ) |
| JOHN O. BRENNAN | ) |
| DIRECTOR | ) |
| CENTRAL INTELLIGENCE AGENCY | ) |
| | ) |
| Defendants | ) |

## COMPLAINT

Plaintiff, James S. Pars, by and through his undersigned counsel, complains of the Defendants as follows:

## INTRODUCTION

1.  Plaintiff brings this action against the Central Intelligence Agency (CIA) and John O. Brennan pursuant to the Administrative Procedure Act (APA), to challenge Defendants' failure to comply with Presidential Policy Directive 19 (PPD-19). Plaintiff seeks a declaration that Defendants are in violation of the APA due to their failure to comply with PPD-19. Plaintiff also asks the Court to order Defendants to fulfill their duties under PPD-19.

## JURISDICTION AND VENUE

2.  This Court has federal question jurisdiction under 28 USC S. 1331, and venue is

proper under 28 U.S.C. S 1391(e).

## PARTIES

3. Plaintiff James S. Pars is a resident of Loudoun County, Virginia and a CIA Intelligence Officer with over 16 years of federal service. The name "James S. Pars" is an alias given to Plaintiff by the CIA when he filed a complaint with the CIA's office of Equal Employment Opportunity (EEO) in or about April 2015.

4. Defendant CIA is an agency of the U.S. government as defined by 5 U.S.C. § 701.

5. Defendant, John O. Brennan, is the Director of the CIA and is sued in his official capacity only.

## FACTS

### Plaintiff's Assignment as Deputy Chief of Base

6. On December 9, 2014, Plaintiff began a one-year Permanent Change of Station (PCS) assignment from the Washington Metropolitan Area (WMA) to a location hereinafter referred to as "the Base," to serve in a management position as Deputy Chief of Base (DCOB). The assignment was scheduled to end on December 9, 2015.

7. The PCS assignment came with significant entitlements and benefits granted to Agency personnel serving in such locations. In addition, Plaintiff was told that if he completed the PCS assignment, he would likely receive a promotion.

8. The Base was located in a conflict zone. Plaintiff was well prepared for the assignment having had three and a half years of management experience in similar locations. Additionally, he had almost six years of field conflict zone experience in a variety of threat environments. By contrast, the Chief of Base (COB) had limited to no conflict zone experience prior to her assignment at the Base.

## Issues with COB

9. Shortly after arriving on Base, Plaintiff began observing unusual and inappropriate behavior by the COB. The COB's behaviors violated US laws and CIA headquarters mandated policies, procedures and direct orders articulated in CIA official message traffic. The COB ran the base like a college dormitory. Her behavior negatively impacted the Base's ability to meet its mission of assisting Intelligence Community (IC) and US military partners, and endangered the lives of personnel.

10. The COB admitted to Plaintiff that she was "wrecked" and "horribly depressed" because she missed her family.

11. The COB placed her personal needs of cooking, baking, socializing, entertainment, exercise and shopping above the needs of the mission often going days and sometimes more than a week without meeting with key personnel.

12. The COB continually put herself and personnel in danger by insisting that they travel in areas of indirect fire attack (IDF) when not operationally necessary—such as trips for food, shopping or to the gym—contrary to US Military personnel movement guidance. In one instance, the COB and her personnel traveled through the same area hit by a rocket about 10 minutes after transiting the area.

13. The COB adopted certain U.S. Military members to feed and entertain on base. She referred to these military members as her "adopted sons." The COB would frequently spend hours entertaining her adopted sons.

14. The COB gave preferential treatment to her adopted sons to the detriment of other personnel.

15. One of her adopted sons was the Base Officer in Charge (OIC).

16. The OIC supervised a CIA Technical Information Systems Officer (TISO) who was not an adopted son and therefore, did not receive any preferential treatment from the COB. Rather, the COB allowed the OIC to blatantly shirk his duties often with negative consequences for the TISO.

17. The COB allowed the OIC to watch television all day long and dump his assignments on the TISO.

18. The COB allowed the OIC to show up late for his shift on a consistent basis, causing the TISO to have to work part of the OIC's shift.

19. The COB ordered Plaintiff to write an award for the OIC even though the OIC did not deserve one, and falsely claimed that the OIC was a stellar officer.

20. The COB undermined Plaintiff's ability to supervise the OIC and other Base personnel.

## Plaintiff's Protected Disclosures Regarding the COB

21. Beginning in mid to late January 2015, Plaintiff discussed in writing and in person his concerns regarding the COB with the Psychological Officer (PO) for the Base. Plaintiff discussed the concerns enumerated in paragraphs 9 to 20.

22. The PO suggested that Plaintiff disclose his concerns to the next person in the chain of command, hereinafter referred to as the "Chief."

23. In early February 2015, while the COB was on Rest and Recuperation (R & R), Plaintiff wrote to the Chief regarding his concerns with the COB. He also had verbal discussions with the Chief regarding the concerns. The Chief's response was to accuse Plaintiff of not supporting the COB. He told Plaintiff that he was wrong to support the TISO. The Chief also reported Plaintiff's disclosures to the COB.

24. When the COB returned from R & R, Plaintiff attempted to speak to her about his concerns but she told him she did not want to hear about it.

25. The situation at the Base continued to deteriorate. The OIC, who was being encouraged by the COB, took advantage of the TISO. There were increased personnel moves through IDF zones for non-mission essential purposes. The COB continued to miss meetings with key US personnel. The COB insisted on increasing social activities on the Base, which had a negative impact on the Base's ability to support the IC and the US military. In one instance, the COB concluded a staff meeting with "Let's get back to cooking," which caused her to miss a meeting with a very senior US military official.

26. Due to the escalating conflict between the OIC and the TISO, on or about February 19, 2015, Plaintiff had two lengthy in-person conversations with the COB regarding the issues enumerated in paragraphs 14 to 18 and 25. Plaintiff told the COB he wanted to work with her to resolve the issues. Instead, the COB escalated the matter to the Chief who, on the following day during a heated telephone conversation, again accused Plaintiff of not supporting the COB. In addition, the Chief tried to coerce Plaintiff into making false accusations against the TISO in order to remove him from the Base.

27. The next day, the COB retaliated against Plaintiff by assigning him to be the compound "noise monitor"; excluding him from key military meetings; extreme micromanaging of all Plaintiff's work; and accusing Plaintiff of "failing miserably" at team building at the Base. The COB also exhibited belligerent and threatening behavior toward Plaintiff.

28. Because of the COB's retaliation and lack of support from the Chief, Plaintiff

reached out to the Chief of Station (COS) for assistance. Plaintiff communicated with the COS in writing and also via virtual teleconference (VTC). Plaintiff reported the issues enumerated in paragraphs 9 to 27. The COS recommended that Plaintiff take his R & R three weeks early on February 24, 2015. Plaintiff was supposed to return to the Base on or about March 17 or 18, 2015. The COS stated that Plaintiff's issues with the COB would be addressed while Plaintiff was on R & R.

29. Plaintiff departed the Base on February 24, 2015 and arrived in the Washington Metropolitan Area on February 25, 2015.

30. Before departing for R & R, Plaintiff contacted the Equal Employment Opportunity (EEO) office point of contact (POC) for the Base and forwarded emails regarding the COB's behavior that he had previously sent to the COS.

31. On March 9, 2015, Plaintiff had a meeting with the EEO POC to discuss his case. The EEO POC had no interest in hearing the details of the events at the Base. He told Plaintiff that it was good to get fired from a job and that Plaintiff should reinvent himself.

32. Also on March 9, 2015, Plaintiff had a meeting with the CIA Deputy Chief for Area Division in charge of the specific territory for the Base, the Chief of the Office for the special area of operation and the Chief of human resources for this specific division. They told Plaintiff that he would not be returning to the Base. Plaintiff inquired about a comparable position in the area of operation, but was told that no job was being offered as a replacement.

33. Unbeknownst to Plaintiff, the COS had sent a "short of tour cable" stating that the COS had lost all confidence in Plaintiff's leadership. The cable contained false and derogatory information about Plaintiff that was used to support the short of tour and send

Plaintiff home early.

34. A short of tour is a very negative career event. As a result of the short of tour, Plaintiff was stripped of the benefits granted to personnel serving in a PCS location. In addition, Plaintiff's career with the CIA has been severely impacted.

35. By contrast, no actions were taken against the COB who was allowed to complete her tour. Personnel and Base operations were modified to accommodate the COB's social and appetite needs. The ability of the Base to assist the IC and US Military partners was significantly degraded. To alleviate the friction between the OIC and the TISO, the TISO was sent to another location. No one replaced Plaintiff as DCOB until close to the end of the COB's tour.

36. The sole reason Plaintiff was sent home short of tour was because he complained about the COB's behavior and mismanagement of personnel and resources.

## Presidential Policy Directive 19

37. President Obama issued PPD-19 on October 10, 2012, to ensure that employees serving in the Intelligence Community or who are eligible for access to classified information can effectively report waste, fraud, and abuse while protecting classified national security information. (Exhibit 1).

38. PPD-19 prohibits retaliation against employees for reporting waste, fraud and abuse and requires covered agencies (of which CIA is one) to provide a review process under which the agency Inspector General shall issue a review to determine whether a Personnel Action violated 5 U.S.C. Section 2302(b)(8). (Exhibit 1).

39. The review process is to adhere to the policies and procedures used by the Office of Special Counsel to adjudicate alleged violations of 5 U.S.C. § 2302(b)(8). These

policies and procedures are found in 5 U.S.C. §§ 1213 and 1214. Under 5 U.S.C. § 1214(b)(2)(A), the OSC has 240 days to make a determination whether there are reasonable grounds to believe that a prohibited personnel practice has occurred. Likewise, the IG's review process is limited to 240 days.

40. PPD-19 also provides for an external review by a three-member Inspector General panel (External Review Panel) chaired by the Inspector General of the Intelligence Community (IC IG). (Exhibit 1).

41. Pursuant to PPD-19, the IC IG issued external review panel procedures. Under these procedures, an employee seeking an external review pursuant to PPD-19 shall provide a formal written request for such a review directly to the IC IG Hotline Manager within forty-five (45) calendar days of receiving an agency's final written disposition on his/her alleged reprisal complaint. (Exhibit 2).

## Plaintiff's Complaints to CIA IG

42. On or about April 3, 2015, Plaintiff complained to the CIA Inspector General's Office (CIA IG) that he was subjected to retaliation following his protected disclosures to the Chief, COB and COS about COB's mismanagement of personnel and resources and her reckless endangerment of personnel.

43. Plaintiff met with two CIA IG investigators on or about April 8 and 9, 2015 to discuss his written summary of events. The CIA IG office initially sent the case to the EEO office.

44. On or about July 8, 2015, Plaintiff met with the CIA IG and asked the CIA IG to conduct a reprisal investigation.

45. The CIA IG purportedly began a reprisal investigation in early October 2015.

Plaintiff provided additional information to the CIA IG in November and December 2015, including a complete list of documents to request or locate and personnel to interview.

46. Plaintiff has contacted the CIA IG multiple times since December 2015 regarding the status of his complaint but to his knowledge, no additional actions have been taken.

47. Plaintiff has refrained from contacting witnesses in order to avoid tampering with the investigation; however, one of Plaintiff's main witnesses informed him that as of July 2016, he had not been contacted by the CIA IG.

48. The CIA IG has not issued a final written disposition on Plaintiff's reprisal complaint pursuant to PPD-19 and the IC IG External Review Procedures. As a result, Plaintiff is unable to request review by the IC IG.

49. Additionally, the significant delay by the CIA IG in investigating Plaintiff's reprisal complaint could significantly damage Plaintiff's ability to substantiate his claims.

## Count 1

### Violation of the Administrative Procedure Act

50. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-49.

51. The Administrative Procedure Act (APA) provides a basis for suit where the federal government has unlawfully withheld or unreasonably delayed action. 5 U.S.C. §§ 555(b) and 706 (1).

52. Under PPD-19 and the IC IG External Review Procedures, the CIA IG was required to investigate whether the CIA retaliated against Plaintiff for reporting the COB's mismanagement of personnel and resources.

53. Under PPD-19 and the IC IG External Review Procedures, the CIA was required

to issue a final written disposition on Plaintiff's reprisal complaint within 240 days.

54.  The CIA IG has had sufficient time to complete its investigation of Plaintiff's reprisal complaint and further delay is unreasonable given the importance the President of the United States has placed on the protection of whistleblowers with access to classified information by issuing PPD-19.

55.  As of the date of this filing, the CIA IG has failed to issue a final written disposition on Plaintiff's reprisal complaint.

56.  Accordingly, the CIA IG has unlawfully withheld or unreasonably delayed action on Plaintiff's reprisal complaint in violation of the Administrative Procedure Act.

WHEREFORE, Plaintiff prays that this Court:

A.  Declare Defendants' failure to complete the investigation of Plaintiff's reprisal complaint and issue a final written disposition to be in violation of the Administrative Procedure Act;

B.  Order Defendants to conclude the investigation of Plaintiff's reprisal complaint and issue a final written disposition by a date certain;

C.  Award attorney's fees and costs pursuant to 28 U.S.C. § 2412 and/or any other appropriate source; and

D.  Grant any other relief the Court deems appropriate and just.

Date: 12/20/2016

Alan Lescht & Associates, P.C.

*/s/ Susan L. Kruger*

Alan Lescht, DC Bar # 441691
Susan L. Kruger, DC Bar # 414566
1050 17th Street, N.W., Suite 400
Washington, DC  20036
202-463-6036
202-463-6067 (fax)
Attorneys for Plaintiff